IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CHELSEA ARIAS, </br> o/b/o L.R.A., a Minor </br> </br> Plaintiff, </br> </br> v. </br> </br> NANCY A. BERRYHILL,[1] </br> Acting Commissioner </br> of the Social Security Administration, </br> </br> Defendant. | ) </br> ) </br> ) </br> ) </br> ) </br> ) Case No. 16-CV-238-JED-PJC </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) |

## REPORT AND RECOMMENDATION

Plaintiff, Chelsea Arias, on behalf of her minor child, L.R.A., seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* For the reasons discussed below, the undersigned recommends that the decision of the Commissioner be **AFFIRMED**.

### I. Social Security Law and Standard of Review

A child under eighteen years of age is "disabled" for the purposes of determining benefits if he has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). A three-step sequential process guides the Commissioner's determination of

---

[1] Effective January 23, 2017, Nancy A. Berryhill replaced Carolyn W. Colvin as Acting Commissioner of the Social Security Administration and is substituted as defendant in this action pursuant to Federal Rule of Civil Procedure 25(d).

whether a child meets the disability criteria. 20 C.F.R. § 416.924(a). The ALJ must determine (1) whether the child is engaged in "substantial gainful activity"; (2) whether the child's impairment or combination of impairments is severe; and, (3) if severe, whether the child's impairment "meets, medically equals, or functionally equals the listings" set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. § 416.924(a).

The third step requires an initial determination of whether the impairment meets the requirements of a listing by satisfying "all of the criteria of that listing, including any relevant criteria in the introduction."[2] 20 C.F.R. § 416.925(c)(3). Next, if the child's impairment fails to meet the criteria, there must be a determination of whether it "medically equal[s] the criteria of a listing." 20 C.F.R. § 416.925(c)(5). Medical equivalence can be found where the child has an impairment included in the listings, but "do[es] not exhibit one or more of the findings specified" for the particular listing examined, or "one or more of the findings is not as severe as specified," yet there are "other findings related to [the] impairment that are at least of equal medical significance to the required criteria." 20 C.F.R. § 416.926(b)(1)(i)-(ii). Last, if the impairment neither meets nor medically equals any listing, there must be a determination of "whether it results in limitations that functionally equal the listings." 20 C.F.R. § 416.926a(a).

For an impairment to be the functional equivalent of a listing, it must be of listing level severity because it results in either marked limitations in two domains of functioning or an extreme limitation in one domain. 20 C.F.R. § 416.926a(a). There is a "marked" limitation in a domain where the impairment(s) interferes seriously with the child's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). "It is the equivalent of the

---

[2] An impairment cannot meet one of the listings merely on the basis of a diagnosis. There must be "a medically determinable impairment(s) that satisfies all of the criteria." 20 C.F.R. § 416.925(d).

2

functioning [the Commissioner] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.* The regulations further state:

> If you are a child of any age (birth to the attainment of age 18), we will find that you have a 'marked' limitation when you have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score.

20 C.F.R. § 416.926a(e)(2)(iii). There is an "extreme" limitation in a domain where the "impairment(s) interferes *very* seriously with your ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i) (emphasis added). "Extreme" refers to the worst limitations, but "does not necessarily mean a total lack or loss of ability to function." *Id*. "Extreme" represents the equivalent of functioning shown by a valid score at least "three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score." 20 C.F.R. § 416.926a(e)(3)(iii).

In assessing functional limitations, the ALJ considers all relevant factors outlined in 20 C.F.R. §§ 416.924a, 416.924b, and 416.929, including (1) how well the child initiates and sustains activities, whether he needs extra help, "and the effects of structured or supportive settings"; (2) how the child functions in school; and (3) how the child is affected by medications or treatments. 20 C.F.R. § 416.926a(a)(1)-(3). The ALJ examines whether the child functions "appropriately, effectively, and independently" in six domains, *i.e.*, "broad areas of functioning intended to capture all of what a child can or cannot do," compared with the abilities of other unimpaired children the same age. 20 C.F.R. § 416.926a(b)(1). The six domains are "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and

3

manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1)(i)-(vi).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This court's review is confined to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quotations and citations omitted). Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.*

## II. Background

Plaintiff, then a four-year-old female, applied (through her mother) for Title XVI benefits on May 1, 2013, alleging she became disabled on that date. (R. 125-33). Plaintiff claimed that she was disabled due to retinoblastoma, which resulted in the removal of her eye and blindness on the right side; "partio-occipital cortical dysplasia;" asthma, and developmental delays. (R. 142). Plaintiff's claim for benefits was denied initially on July 1, 2013, and on reconsideration on December 12, 2013. (R. 52-79, 87-90). Plaintiff then requested a hearing before an administrative law judge ("ALJ"), and the ALJ held the hearing on September 10, 2014. (R. 32-51). The ALJ issued a decision on November 19, 2014, denying benefits and finding plaintiff not disabled because she did not have the requisite limitations in the domains of functioning. (R. 11-31). The Appeals Council denied review, and plaintiff appealed. (R. 1-3; dkt. 2).

The ALJ found that plaintiff, a preschooler at the time of her application and a school-age child at the time of the decision, had not engaged in any substantial gainful activity since the application date of May 1, 2013. (R. 14). The ALJ determined that plaintiff had severe impairments of "retinoblastoma, speech and language delay" *Id.* The ALJ also found that plaintiff's complaints of asthma and headaches were non-severe impairments. *Id.* The ALJ cited evidence that plaintiff's asthma was controlled with medications and that her headaches were mild, "relieved with Tylenol" and associated with seasonal allergies. *Id.* Plaintiff's impairments, however, did not meet or medically equal a listing. (R. 14-15).

The ALJ then reviewed the testimony and the record evidence. Plaintiff's mother testified that the removal of plaintiff's right eye due to cancer resulted in limitations on plaintiff's ability to see things on her right side and on plaintiff's depth perception. (R. 16). Plaintiff also had difficulty writing, holding a pen, and comprehending difficult material in school. *Id.* Plaintiff's mother reported that plaintiff's teacher had recommended holding plaintiff back a year in school due to issues with plaintiff's speech and sight reading. *Id.*

Plaintiff was diagnosed with retinoblastoma in 2010 and required surgery to remove her right eye. *Id.* She now wears a prosthetic eye. *Id.* A consultant conducted a visual evaluation of plaintiff in her early childhood classroom in May 2013. *Id.* Plaintiff was not wearing her glasses at the time. *Id.* The consultant recommended a number of accommodations for plaintiff such as font size of 14 or larger when plaintiff did not wear her glasses, the use of a "slant stand" for reading, a writing stand, and the ability to move around the room to accommodate her limited field of vision. *Id.* She also noted that plaintiff needs to scan her surroundings due to field loss. *Id.* A vision examination in September 2013 revealed that plaintiff had 20/20 vision in her left eye. *Id.* At that time, plaintiff's mother reported that plaintiff was attending kindergarten full time and was able to

sit in the front of the classroom. *Id.* Plaintiff's mother reported "some white reflex in the right eye," so plaintiff underwent an MRI to check for brain issues. *Id.* According to the ALJ, the MRI showed "no definite evidence of residual or recurrent tumor or any intracrainal tumor on the left." (R. 17).

The ALJ also concluded that plaintiff's alleged development delays were "largely resolved." *Id.* The ALJ relied on a March 2013 psychological assessment, which included statements from plaintiff's mother that speech and occupational therapy had improved plaintiff's speech and visual-motor coordination. *Id.* The ALJ found that a parents' survey completed as part of that evaluation showed that plaintiff's mother "denied any significant problems" regarding plaintiff's behavior, attention, hyperactivity or impulsivity, "social development, cognitive functioning, or memory functioning." *Id.* Testing performed as part of the evaluation showed that plaintiff's IQ was 90, within the average range. *Id.* The examiner found that plaintiff was a typical child, with the only deficit of note being "mild difficulty with fluid reasoning." *Id.*

The ALJ noted that an April 2013 occupational therapy evaluation showed that plaintiff had some delays with visual motor skills due to her vision limitation and with pre-writing skills. *Id.* Aside from those delays, plaintiff exhibited age-appropriate ability in the areas of fine motor skills, visual perception, sensory processing integration and self-care. *Id.* A speech therapy evaluation showed that plaintiff had some delays in her ability to repeat sentences and use adjectives as well as "below average receptive/expressive abilities" and "difficulty paying attention to tasks." *Id.* Plaintiff was given an IEP for her kindergarten year, in which she received both speech/language and occupational therapy. *Id.* Plaintiff's mother testified, however, that plaintiff did well in kindergarten and that her speech issues were resolved. *Id.*

The ALJ found plaintiff's mother's testimony "largely credible." *Id.* However, based on the mother's testimony and written reports and the medical evidence in the record, the ALJ found that

plaintiff's limitations were not disabling. (R. 17-18). The ALJ gave great weight to the agency physicians' opinions that plaintiff's impairments did not meet or equal a listing, finding them "balanced, objective, and consistent with the evidence of record as a whole." (R. 18). The ALJ gave substantial weight to the opinion of plaintiff's pre-kindergarten teacher, who cited slight to moderate problems in the areas of acquiring and using information and in attending and completing tasks. *Id.* The ALJ then discounted that opinion, noting that the teacher submitted the opinion at the same time plaintiff alleged her disability began and that plaintiff's mother's more recent testimony demonstrate that plaintiff has improved significantly. *Id.* The ALJ also gave considerable weight to opinion of psychologist Dr. Kendra Parris, who performed the assessment that found plaintiff to be developing at an age-appropriate rate other than some "mild difficulty with fluid reasoning." *Id.* The ALJ gave no weight to an opinion from Aletha Shrum, an occupational therapist who opined that plaintiff struggles with visual and fine motor skills and has marked limitations in five of the six domains: acquiring and using information, attending and completing tasks, caring for herself, health and physical well-being, and moving about and manipulating objects. *Id.*

The ALJ concluded that plaintiff had the following limitations in the six domains of functioning:

(1) In the area of acquiring and using information, plaintiff had a less than marked limitation. (R. 20). The ALJ noted plaintiff's "mild difficulty with fluid reasoning" and the classroom accommodations necessary to address plaintiff's visual limitations. *Id.* The ALJ also cited the opinions of the agency physician, plaintiff's pre-kindergarten teacher, and the psychologist who conducted an evaluation, all of which noted "slight to moderate problems" in this area. *Id.*

(2) In the area of attending and completing tasks, plaintiff had a less than marked limitation. (R. 21). The ALJ found that plaintiff has some difficulties, but the ALJ relied on plaintiff's mother's testimony that plaintiff exhibits age-appropriate behavior and the opinion of plaintiff's pre-kindergarten teacher, which stated that plaintiff has only "slight to moderate problems" with attention and concentration. *Id.*

(3) In the area of interacting and relating with others, plaintiff had a less than marked limitation. (R. 22). Plaintiff has a minor speech delay, but her speech is intelligible. *Id.* Plaintiff also gets along well with others and has no difficulty with social interactions. *Id.*

(4) In the area of moving about and manipulating objects, plaintiff had no limitation. (R. 23). The ALJ cited testimony that plaintiff "has some difficulty with fine motor control such as holding a pen correctly" and some issues with activities that require depth perception. (R. 23-24). However, the ALJ relied on the opinion of the pre-kindergarten teacher, who stated that plaintiff has no limitations in this area. (R. 24). The ALJ also relied on evidence that plaintiff can ride a bicycle, write her first name, and use scissors. (R. 23).

(5) In the area of caring for yourself, plaintiff had no limitation. (R. 25). Plaintiff was able to dress and feed herself. *Id.* She could also take care of her personal hygiene with little assistance. *Id.* Plaintiff's pre-kindergarten teacher also observed that plaintiff "handles frustration appropriately, uses good judgment regarding personal safety, and knows when to ask for help." *Id.*

(6) In the area of health and physical well-being, the ALJ found that plaintiff had a less than marked limitation. (R. 26). The ALJ found that plaintiff's retinoblastoma is in remission and that the surgery to remove her right eye in 2010 was successful. *Id.* Plaintiff's vision is 20/20 in her left eye with glasses. *Id.* She is able to attend school full-time and is doing well with some accommodations for her vision, such as sitting in the front of the classroom. *Id.* The ALJ found that plaintiff's

headaches were mild and related to allergies and that her asthma was well-controlled with medication. *Id.*

Because plaintiff did not have a marked limitation in at least two domains of functioning or one extreme limitation, the ALJ concluded that plaintiff was not disabled. (R. 27).

### III. Analysis

On appeal, plaintiff asserts two points of error: (1) that the ALJ erred in weighing the evidence and should have found marked limitations in at least two of the domains of functioning and concluded that plaintiff met the functional equivalent of a listing; and (2) that the ALJ failed to perform a proper credibility analysis. (Dkt. 10).

#### A. Functional Equivalent of a Listing

Plaintiff contends that the ALJ made a number of errors in considering the evidence and, that, had the ALJ properly considered the evidence, she would have found marked limitations in at least two domains of functioning. *Id.* Specifically, plaintiff argues (1) that the ALJ erred in weighing the opinion of occupational therapist, Aletha Shrum; (2) that the ALJ should have considered different evidence in evaluating plaintiff's ability to acquire and use information; (3) that the evidence of plaintiff's inability to attend and complete tasks requires a finding of a marked limitation; and (4) that the ALJ "glosses over" the evidence of plaintiff's headaches and insomnia in considering her limitations in the domain of health and physical well-being. *Id.*

##### 1. Opinion of Occupational Therapist

The record includes a "Childhood Disability Evaluation Form" dated September 9, 2014, completed by Aletha Shrum, an occupational therapist. (R. 497-500). In that form, Ms. Shrum opines that plaintiff has deficits in her "educational cognitive abilities visual motor, fine motor, motor planning/sequencing." (R. 498). Ms. Shrum cited three tests results – the Beery VMI

Developmental Test of Visual Motor Integration, the Beery VMI Motor Coordination Subtest, and the Developmental Eye Movement Test – as evidence that plaintiff is "significantly below average for [her] age level." *Id.* Ms. Shrum opined that plaintiff had marked limitations in the domains of acquiring and using information, attending and completing tasks, moving about and manipulating objects, caring for yourself, and health and physical well-being. (R. 498-500). The opinion states that, physically, plaintiff has issues with fine motor skills, including completing puzzles, "copying simple designs," catching a ball, and dressing herself. (R. 499-500). Plaintiff also used a cane/walking stick and suffered from decreased functional mobility due to her vision issues. *Id.* Cognitively, plaintiff was easily distracted, had difficulty sitting still, and needed to have instructions repeated for her. (R. 499). She also had difficulty retaining information, recognizing letters and sight words, and counting to twenty consistently. (R. 498).

The ALJ gave little weight to Ms. Shrum's opinion for two reasons. First, the ALJ found that "the record contains no evidence of any treating relationship between Ms. Shrum and [plaintiff], other than that contained in the opinion form itself." (R. 18). Second, the ALJ found that Ms. Shrum's opinion was significantly different from the other evidence in the record. *Id.*

Plaintiff argues that the ALJ should not have "summarily dismissed" Ms. Shrum's opinion because there is evidence in the record that Ms. Shrum was plaintiff's occupational therapist for at least thirteen months prior to the hearing. (Dkt. 10). Plaintiff contends that this evidence of "a longitudinal relationship [] bolsters Ms. Shrum's opinion" that plaintiff has marked limitations in five of the six domains of functioning. *Id.*

The regulations and Social Security Rulings (SSR) in effect at the time plaintiff filed her claim categorized occupational therapists as an "other medical source" rather than an "acceptable

medical source."[3] 20 C.F.R. § 416.913 (2016). An ALJ was not required to consider "other medical sources," and "other medical sources" could not be used to establish the existence of a severe impairment. *See* 20 C.F.R. § 416.913(d) (2016). SSR 06-03p explained that the regulations categorizing acceptable medical sources and other medical sources did "not explicitly address how to consider relevant opinions and other evidence from 'other sources.'" SSR 06-03p (now rescinded). SSR 06-03p provides that an ALJ should consider the evidence if it is relevant and should apply the same factors used to evaluate acceptable medical source opinions. *Id.* (citing 20 C.F.R. §§ 404.1527(d) and 416.927(d)).

Although an ALJ must consider the "other source" evidence, "there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision." *Id.* The ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* The Tenth Circuit has applied this ruling as it is written, upholding ALJ findings where the reasoning is clear, even when the ALJ's analysis does not follow a step-by-step analysis of the factors or expressly state the weight given to the opinion of an "other source." *See, e.g.*, *Endriss v. Astrue*, 506 F. App'x 772, 777-78 (10th Cir. 2012) (unpublished)[4] (holding that the ALJ "complied with our case law and

---

[3] Effective March 27, 2017, the regulations regarding medical opinion evidence were amended to eliminate the distinction between "acceptable medical sources" and "other medical sources." *See* 20 C.F.R. ' 416.913 (2017). The new regulations also impact the way medical opinions are weighed. *See, e.g.*, 20 C.F.R. § 416.920c (2017). These changes to the regulations also impacted the relevant SSRs, particularly SSR 06-03p, which has not been rescinded However, because these amendments clearly state that they are effective for claims filed on or after March 27, 2017, the undersigned applies the previous version of the regulations and SSRs to this appeal of the final administrative decision.

[4] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for

SSR 06-03p by explaining the weight he assigned to [a chiropractor's] opinion and the reason for that weight" and, with respect to a physical therapist's opinion, by giving a sufficient explanation to allow the Court to "follow the adjudicator's reasoning"); *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1164-65 (10th Cir. 2012) (finding "no harmful error" in an ALJ's decision not to give weight to "a nonacceptable medical source" when the Court could follow the ALJ's reasoning); *Conger v. Astrue*, 453 Fed.Appx. 821, 824-25 (10th Cir. 2011) (unpublished) (holding that "[t]he ALJ did not expressly mention SSR 06-03p, or the factors articulated therein, but we do not require an explicit discussion of the factors in a decision") (citation omitted).

  Plaintiff cites to a questionnaire completed by the mother, identifying Ms. Shrum as the occupational therapist, as proof that Ms. Shrum was a treating medical source. (R. 162). Additionally, in reviewing the record, the undersigned notes that plaintiff's mother also referred to Ms. Shrum by her first name during the hearing. (R. 42). Although the undersigned agrees that this indirect evidence is sufficient to establish that plaintiff was receiving occupational therapy and that Ms. Shrum was the treating source, the ALJ's conclusion that there is no evidence to establish Ms. Shrum as a treating source is harmless error for two reasons. First, the ALJ correctly points out that the record contains no treatment records from Ms. Shrum. If Ms. Shrum has seen plaintiff twice a week for thirteen months, there should be records of those visits that would provide details of plaintiff's condition and progress over the course of treatment. Second, and more importantly, the ALJ gave a substantive reason for giving little weight to Ms. Shrum's opinion – the inconsistency between her findings and the other medical evidence in the record.

---

their persuasive value."

Ms. Shrum opined that plaintiff had marked limitations in five domains of functioning based on deficiencies in her motor-visual skills, fine motor skills, and cognitive abilities, particularly with respect to focus and concentration. (R. 498-500). However, the psychological assessment performed in March 2013, just a few weeks before plaintiff's alleged disability onset date, noted that plaintiff's only area of weakness was a "mild difficulty with fluid reasoning." (R. 358, 362). The psychologist explained that part of that weakness might be attributed to plaintiff's visual limitations, stating that "on the nonverbal fluid reasoning tasks (e.g., choosing the next picture in a series), [plaintiff] often chose her response based on the one picture immediately preceding the blank square . . . . [and] may not have viewed the entire sequence." (R. 358). This limitation was not severe enough to elicit a DSM diagnosis, and the only recommendations were for plaintiff to continue her speech, vision, and occupational therapy sessions and to practice her academic skills at home by reading books and playing "games using numbers." (R. 362).

An occupational therapy evaluation conducted in April 2013, less than a month before plaintiff's alleged disability onset date, found that plaintiff "demonstrated age level fine motor, visual perceptual, sensory processing integration, and self-care skills" but "presents with delays in visual motor skills, bilateral coordination, and pre-writing skills." (R. 247). The therapist recommended that plaintiff receive two hours of occupational therapy each month to practice skills such as copying shapes, completing mazes and connect-the-dot puzzles, using scissors, and copying her name. *Id.* These conservative recommendations contradict Ms. Shrum's findings of more severe limitations.

Plaintiff's mother's testimony also contradicts Ms. Shrum's assessment of marked limitations. Plaintiff's mother testified that plaintiff still needs training in "kinesthetics," which will help her be more aware of her surroundings, given her monovision. (R. 41-42, 48-49). Plaintiff's

13

issues with depth perception were "pretty normal given her circumstances. Nothing too severe." (R. 46). Plaintiff's mother also downplayed the issue of focus and attention, testifying that plaintiff has "a little bit of that problem" and that poor sleep impacts her ability to pay attention. (R. 45-46). Plaintiff's speech issues were resolved. (R. 48).

Plaintiff's mother's biggest concern was that plaintiff would fall behind in school. (R. 46-47). She testified that plaintiff was having trouble holding her pen correctly and was falling behind with reading comprehension and sight words. *Id.* She confirmed that plaintiff's kindergarten teacher had recommended holding plaintiff back a year, but she stated that plaintiff was able to catch up over the summer before entering first grade. (R. 47-48). Plaintiff's mother expressed concern that plaintiff would continue to fall behind as she progressed into more advanced subjects. (R. 46-47).

Nothing in the record supports Ms. Shrum's assessment of plaintiff's limitations. To the contrary, in the month or two before her alleged disability onset date, plaintiff's test results revealed only minor deficits in cognitive and motor functioning. Plaintiff's pre-kindergarten teacher's observations, made in May 2013, are consistent with these evaluations, as are the observations of the vision consultant who made recommendations for simple classroom accommodations. (R. 300-303, 315-22). Plaintiff's mother testified that plaintiff was improving with therapy.

For these reasons, the undersigned recommends a finding that the ALJ did not err in giving little weight to the opinion of occupational therapist, Aletha Shrum.

### 2.   Acquiring and Using Information

Plaintiff argues that the evidence supports a finding of marked limitation in the domain of acquiring and using information based on the psychological assessments sub-set test results in fluid reasoning, plaintiff's teacher's assessment that plaintiff has "obvious" problems with learning new

material, Ms. Shrum's assessment, and plaintiff's mother's testimony that plaintiff's kindergarten teacher recommended holding her back a year. (Dkt. 10). Plaintiff contends that the first three pieces of evidence cited above give weight to Ms. Shrum's assessment. *Id.*

The ALJ found that plaintiff had a less than marked limitation in acquiring and using information. (R. 20). The ALJ relied on plaintiff's IQ scores, the pre-kindergarten teacher's assessment that plaintiff had "slight to moderate problems," and the psychological evaluation. *Id.* The ALJ also took into account the classroom accommodations plaintiff would need to address her visual impairment. *Id.*

This decision is supported by substantial evidence in the record. Plaintiff's argument, then, is simply an attempt to have the Court reweigh the evidence. This the Court cannot do, even if the Court would have reached a different decision. *See Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005); *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

### 3.     Attending and Completing Tasks

Plaintiff argues that the ALJ should have found a marked limitation in the domain of attending and completing tasks based on the evidence of plaintiff's limited ability to sit still and focus. (Dkt. 10). Plaintiff relies on the pre-kindergarten teacher's assessment that plaintiff has "an obvious problem" with completing assignments and completing them accurately and with focusing and sustaining attention, as well as the Individual Educational Plan's ("IEP") notation that plaintiff was difficult to test for speech therapy because she could not focus and was moving constantly. *Id.* Plaintiff contends that, if she has difficulty at the pre-kindergarten level, when requirements are low, she will have even more difficulty meeting educational standards as they become more rigorous. *Id.*

In her decision, the ALJ acknowledged that the report from plaintiff's IEP noted difficulty

maintaining focus during the speech and language evaluation. (R. 21). However, the ALJ found that the remaining evidence in the record – the pre-kindergarten teacher's assessment of "slight to moderate" problems, the psychological assessment of no issues with "hyperactivity or impulsivity," and plaintiff's mother's testimony that plaintiff "displays age-appropriate behavior and attention at home and school" outweighed the note in the IEP.

Again, plaintiff is simply asking the Court to re-weigh the evidence. The Court cannot do so. *See Hackett*, 395 F.3d at 1172; *White*, 287 F.3d at 908.

### 4.     Health and Physical Well-Being

Plaintiff argues that the ALJ "glosses over" the complaints of headaches and insomnia by concluding that they are linked to seasonal allergies and not an abnormality in plaintiff's brain. (Dkt. 10). Plaintiff also argues that her headaches lead to insomnia, which results in additional difficulty in the areas of attending and completing tasks and acquiring and using information. *Id.*

The ALJ discussed plaintiff's headaches at step two. (R. 14). The ALJ found that the evidence demonstrated that plaintiff has headaches up to three times per week and that her headaches lead to insomnia, which causes her to be "cranky." *Id.* The ALJ noted that plaintiff's mother testified that the headaches were "mild and relieved with Tylenol." *Id.* The ALJ also cited to a January 2014 neurological evaluation, in which it was "suggested" that plaintiff's headaches were due to seasonal allergies. *Id.* Based on this evidence, the ALJ found plaintiff's headaches to be non-severe. *Id.* Consistent with the regulations, however, the ALJ took plaintiff's headaches into account in assessing her limitations in the domains of functioning. Based on the evidence cited at step two, the ALJ concluded that plaintiff's headaches, in conjunction with her other physical impairments, created a less than marked limitation in the area of health and physical well-being. (R. 26).

The neurological records indicate that plaintiff was first seen for headaches in November 2011. (R. 509-510). The neurologist noted that plaintiff had a previous abnormal brain scan and EEG. *Id.* The treatment record indicates that the brain scan showed an "undetermined lesion right lateral recess fourth ventricle with restricted water diffusion suggestive of either anatomic variant, cerebellar cortical dysplasia or tumor process." (R. 510). Plaintiff reported improvement on a low dose of gabapentin in February 2012. (R. 507). Plaintiff then discontinued the gabapentin in April 2012 due to side effects, but plaintiff reported increased headaches in May 2012, so the neurologist recommended restarting the medication. (R. 348). The neurologist opined at that time that he believed the headaches were "functional." (R. 349). By December 2012, plaintiff's headaches were "not problematic," so the neurologist discontinued "prophylaxis and abortive therapy" for the headaches. (R. 346). The neurologist also noted that plaintiff's insomnia was "infrequent and likely provoked by fatigue." *Id.*

Plaintiff reported in June 2013 that the headaches had returned. (R. 343). The neurologist suspected migraines, but "due to the observation by mother that poor sleep appears to provoke headaches," he prescribed a sleep medication and recommended changes in plaintiff's "sleep hygiene." *Id.* This new regimen improved plaintiff's headaches, so the neurologist continued plaintiff's medication in September 2013. (R. 504-05). In January 2014, the last appointment before the ALJ hearing, plaintiff reported increased insomnia but stated that her headaches were now only associated with seasonal allergy symptoms. (R. 502-03). The neurologist opined that plaintiff's increased insomnia was caused by "clonazepam tachyphylaxis" and prescribed an increased dose. (R. 503).

Based on this evidence, the undersigned finds that the ALJ's discussion of plaintiff's headaches was sufficient, and the ALJ's determination that plaintiff's headaches and asthma are

17

non-severe is supported by substantial evidence. It follows, then, that the ALJ's conclusion that plaintiff had a less than marked limitation in the domain of health and physical well-being is also supported by substantial evidence.

### B. Credibility

Plaintiff argues that the ALJ erred in assessing the credibility of plaintiff's mother's testimony. (Dkt. 10). Specifically, plaintiff argues that the ALJ's decision relies only on boilerplate language and fails to apply the relevant factors. *Id.* Plaintiff contends that the ALJ's credibility analysis is limited to the following single statement that does not meet the minimum requirements for a credibility determination: "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, even as alleged, the child's impairments are not disabling." *Id.*

Although the Social Security Administration has eliminated the use of the term "credibility" from the agency's sub-regulatory policy, the agency continues to evaluate a disability claimant's symptoms using a two-step process:

> First, we must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain. Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities for an adult . . . .

SSR 16-3p (superseding SSR 96-7p).[5]

---

[5] SSR 16-3P was issued after the date of the ALJ's decision in this case. However, the two-step process substantially restates the prior two-step process set forth in SSR 96-7, which was characterized by the Tenth Circuit as a three-step process set forth in *Luna v. Bowen,* 834 F.2d 161, 163-64 (10th Cir. 1987), the seminal case regarding credibility followed in the Tenth Circuit. *See, e.g., Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166−67 (10th Cir. 2012).

At step one of the process, "[a]n individual's symptoms, . . . will not be found to affect the ability to perform work-related activities for an adult . . . unless medical signs or laboratory findings show a medically determinable impairment is present." *Id*. At step two, the ALJ may consider, among other things, a number of factors in assessing a claimant's credibility, including

> the levels of medication and their effectiveness, the extensiveness of the attempts . . . to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (internal quotation marks and citations omitted); see 20 CFR 404.1529(c)(3) and 416.929(c)(3).

"[C]redibility determinations are peculiarly the province of the finder of fact, and [the court] will not upset such determinations, when supported by substantial evidence." *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010) (internal quotation marks and citation omitted). Those findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.* (internal quotation marks and citation omitted). However, "common sense, not technical perfection, is [the] guide" of a reviewing court. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012). "Our precedent does not require a formalistic factor-by-factor recitation of the evidence . . . '[s]o long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility.'" *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009) (quoting *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000)).

Contrary to plaintiff's assertion, the ALJ did conduct an assessment of plaintiff's mother's credibility. The ALJ determined that "the allegations of Ms. Arias are largely credible." (R. 17). The ALJ noted that plaintiff's mother had completed questionnaires and a function report that outline some problems but generally conclude that plaintiff functions well. *Id.* Accordingly, the ALJ accepted plaintiff's mother's testimony but determined that *despite* accepting the truth of those

19

allegations, plaintiff still was not disabled. Plaintiff simply misreads the ALJ's decision.

## IV. Conclusion

The undersigned finds that the ALJ properly evaluated the occupational therapist's opinion and cited substantial evidence to support her findings regarding plaintiff's limitations in each of the six domains of functioning. The ALJ also did not err in assessing plaintiff's mother's credibility. Accordingly, the undersigned recommends that the decision of the Commissioner finding plaintiff is not disabled be **AFFIRMED**.

## V. Objections

In accordance with 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation, but must do so by June 7, 2017. If specific written objections are timely filed, the District Judge assigned to this case will make a *de novo* determination in accordance with Rule 72(b). A party waives District Court review and appellate review by failing to file objections that are timely and sufficiently specific (the "firm waiver rule"). *Moore v. Astrue*, 491 F. App'x 921, 923 (10th Cir. 2012) (unpublished) (citing *United States v. One Parcel of Real Property*, 73 F.3d 1057, 1060 (10th Cir. 1996)).

**ENTERED** this 24th day of May, 2017.

_____
Paul J. Cleary
United States Magistrate Judge